# CHARLESTON.

## STATE v. J. E. BOGGS.

Submitted February 15, 1921.    Decided February 22, 1921.

1.    ARREST—*Officer Not Justified in Shooting Suspected Misdemeanant on Refusal to Stop When Ordered.*

An officer seeking to arrest a misdemeanant is not justified in shooting or wounding a traveler on the highway whom he has reason to believe is the misdemeanant, and whom he

has ordered to halt for the purpose of ascertaining if he is the person for whom he is seeking, where the traveler simply refuses to obey the command, and pursues his journey hurriedly and in such manner as would lead the officer to believe he is the misdemeanant, indicating an escape. (p. 743).

2. CRIMINAL LAW—*Error in Ruling on Evidence Not Ground for Reversal Where Verdict Would Not Have Been Changed.*

Error in the admission or rejection of evidence will not be sufficient ground for reversal when it appears upon the whole case, including the admissions of the defendant, that the verdict would not have been changed, and ought to be affirmed. (p. 746).

3. SAME—*Statute Authorizing Special Verdicts Inapplicable to Jury Trial in Criminal Cases.*

Sec. 5, chap. 131 of the Code, authorizing the circuit court to submit interrogatories to the jury upon the trial of any issue for the purpose of having it render separate verdicts upon any one or more of the issues, does not apply to jury trials in criminal cases. (p. 748).

Error to Circuit Court, Harrison County.

J. E. Boggs was convicted of assault with intent to kill, and he brings error.

*Affirmed.*

*Law & McCue,* for plaintiff in error.

*E. T. England,* Attorney General, *R. A. Blessing,* Assistant Attorney General, and *Steptoe & Johnson,* for the State.

LIVELY, JUDGE:

This writ of error brings up for review the judgment of the Criminal Court of Harrison County rendered on the 18th of November, 1920, which sentenced J. E. Boggs to confinement in the penitentiary for two years on a verdict finding him guilty of an unlawful assault with intent to maim, disfigure, disable and kill Clyde Coffindaffer.

A justice of the peace had issued a warrant for the apprehension of Joe Costa for a violation of the prohibition law and had appointed John Siers as a special constable to make the arrest. Siers had obtained information that Costa was expected to arrive at Clarksburg in the nighttime in an automobile with a load of spirituous liquors, and that he would come from Shinnston by the Maulsby bridge across the West Fork river.

He had received information that Costa was a "bad" man and would likely resist arrest and that there would be danger in making the arrest. He secured the assistance of Boggs, the defendant, and George Darnell, both of whom were members of the Department of Public Safety and stationed at that time in the vicinity of Clarksburg, where there was an industrial disturbance, informing them of the character of the person to be arrested and the possible danger attending the arrest. This special constable and these two members of the Department of Public Safety went in an automobile to the Maulsby bridge, arriving there about 9 o'clock on the evening of October 5, 1920, and stationed themselves at the end of the bridge nearest to Clarksburg for the purpose of apprehending Costa should be pass that way. The bridge was a covered bridge and about 20 feet wide and the record does not disclose its length. They had detained, temporarily, several persons until about the hour of 10:30 P. M., when an automobile coming from the direction of Shinnston entered the bridge. In this automobile were Dr. Clyde Coffindaffer, F. Byrl Wyer, and wife, and John Ashcraft, who was driving the car. Clyde Coffindaffer was a physician, well known in that community, practicing his profession at Clarksburg and was then taking Mrs. Wyer, who was suffering from peritonitis, to a hospital at Clarksburg. She was sitting on the rear seat with her husband on her left side. The doctor was sitting in the right front seat by the side of Ashcraft and had his back toward the right door of the car and was assisting in steadying Mrs. Wyer with his left hand. This car was a four seated Chandler chummy roadster and was somewhat similar to the car which Costa was supposed to be using. It appears that Siers, the special constable, was standing on the left hand side of the bridge a short distance inside thereof and to the left of this car as it approached. He had an electric flashlight in one hand, which he waved at the approaching car, and two of the witnesses in the car stated that he had a pistol in the other hand. Siers denied that he had a pistol. Boggs was on the right hand side of the car as it approached and inside of the covered bridge a short distance and just in front of another car which was standing there, which had been detained and which belonged to a

Mr. Raikes. Darnell was also standing on the same side of the bridge and a short distance from the other end of the last named car. As the doctor's car approached these men it slowed down, but as Siers and Boggs approached it, seemingly in a threatening manner and without giving information of their design, the chauffeur quickly "put on more gas" and the speed of the car was quickly accelerated. Shooting then began and there is considerable conflict as to whether the first shot was fired from the left hand side of the car or from the other side. Siers states that Boggs was on the same side of the bridge with himself. Boggs stated that he was on the opposite side and all of the other witnesses place him on the opposite side from Siers. All of the occupants of the car state that the first shot penetrated the rear left hand tire of the car, releasing the air therefrom and almost immediately after the first shot the man standing on the opposite side of the car and four or five feet from the car presented his pistol at Dr. Coffindaffer and shot him in the back, the doctor exclaiming, "Oh I am shot." The car was in rapid motion and after it left the bridge some more shots were fired. The wounded man was immediately taken to the hospital at Clarksburg where he received medical attention. The testimony of Boggs does not coincide with that of the occupants of the car respecting the actual shooting. He corroborates the State's evidence as to the place he was standing but testified that after he approached the car when it slowed down and after it had started to go faster, he commanded them to halt and that the car had passed him and had almost reached Darnell, who was standing several feet from him, when Darnell also called on the car to halt and he, Boggs, then began shooting, not at the occupants of the car, but at the tires, and for the sole purpose of stopping the car. He did not know that anyone was shot that night and had no idea that anyone had been wounded until the next morning when he heard from Siers or saw it in the newspapers that Dr. Coffidaffer had been severely wounded. He stated both before and on the trial that all of the shots which were fired that night were fired by him with a 45 Colts army revolver. Immediately upon learning that Dr. Coffindaffer had been wounded he came to Clarksburg, admitted the shooting to the sheriff and

others, and went to the doctor's sick room where he admitted the shooting, but stated that he had no intention whatever of hurting anyone and that his shots were in good faith at the tires of the automobile and for the purpose of stopping it in order to make the arrest of Costa.

Boggs, Siers and Darnell were indicted for malicious wounding and Boggs elected to be tried separately. On the evidence, a summary only of which is above given, the jury found the defendant not-guilty of malicious wounding but of unlawful wounding with the intent to maim, disfigure, etc. Five instructions were offered by the State, all of which were objected to by the defense, but all were given except instruction No. 3. Instruction No. 1 was to the effect that an officer had no right to kill or attempt to kill in endeavoring to make an arrest for a misdemeanor and unless the jury believed from the evidence that these officers were attempting to arrest Coffindaffer for the committing of a felony or in the act of committing a felony that the defendant was not authorized to shoot with intent to kill for the purpose of arresting Coffindaffer. This instruction simply lays down the law of arrest and it is to the effect that defendant was not justified in shooting Coffindaffer with intent to maim etc., unless the jury believed that Coffindaffer was doing an act which would justify such shooting. We can see no good objection to this instruction. It is apparent that defendant and the other officers were attempting to make the arrest of Joe Costa, the person for whom they had the warrant, and when the car began to go faster at the command to halt they erroneously concluded that Dr. Coffindaffer was the person for whom they had the warrant or that he was in that car; and the instruction simply propounded the law applicable to that situation, to the effect that an officer is not justified in shooting with intent to kill the person for whom he has a warrant unless that person has committed or is in the act of committing a felony; and in no case is an officer justified in shooting with like intent in making an arrest for a misdemeanor. The instruction is further objected to because there was no evidence of any attempt to kill anyone on that occasion; that the shooting was accidental. But the evidence of all the witnesses who were in the car was

positive that the pistol which did the wounding was fired at Dr. Coffindaffer's back when only a few feet from him. The question whether it was accidental or intentional is one for the jury. A man is presumed to intend that which he does or which is the immediate or necessary consequence of his act. If the jury believed beyond a reasonable doubt that the shot was fired with the intent to kill or wound the doctor, then there was no justification unless they further believed that the doctor was committing or attempting to commit a felony. These officers were evidently attempting to make an arrest, or at least, to stop the occupants of the car for the purpose of ascertaining if Costa was therein in order to make the arrest. Neither purpose alone would justify the shooting of the occupants unless with the qualification set out in the instruction. It is argued that the doctor should have stopped and permitted these men to make examination of the car and search for Costa. But even if this be true, and he did not stop or permit search, that alone would not justify the defendant in shooting him, or in such reckless shooting as would be likely to kill or wound any of the occupants of the car.

Objection is made to instruction No. 2, which was given for the State, because it is more or less abstract in laying down the law of arrest, in that an officer acts at his own peril in making such arrest; that it is unlawful in making the arrest of a person without at the time having a warrant for him unless he is at the time committing a felony or in the act of committing a felony, or has committed some offense less than a felony in the presence or view of such officer. While this instruction is somewhat abstract, we cannot see that it might have or did mislead the jury. *Reed's Case,* 98 Va. 817.

Instructions numbered four and five given for the state, while objected to at the trial, are not insisted upon as error here. We can see no error in them. They correctly state the law on reasonable doubt as to the guilt of the prisoner.

Five instructions were asked for by the defendant and all given except No. 3, which was refused, and error is assigned for that reason. This instruction was to the effect that the defendant then assisting officers who had a warrant for Costa

and awaiting him on the bridge, had the lawful right to temporarily detain Dr. Coffindaffer long enough to ascertain if he was Costa or some other person and to use such reasonable force as was necessary to cause the doctor to pause for that purpose, if he refused such request.

The evidence did not disclose that Dr. Coffindaffer or any other person in the car knew that these men had a warrant for Costa or for any other person. He knew Siers but it must be remembered that Siers was a special constable for this arrest only. Their mission was not known to him, nor did he know that they were officers; and the command of "halt" was not very communicative of their authority or design. Besides if they had any right to detain him temporarily, the force used was not reasonable. We cannot accede to the proposition that an officer with a misdemeanor warrant may station himself on the highway and command innocent persons to halt, and if they, not knowing the intention or design, refuse to do so, that the officer is then justified in shooting those refusing, or in shooting so recklessly that fatalities or serious injuries may occur. It is well settled that where an arrest for a misdemeanor has been made, and the prisoner breaks away, the officer is not justified in shooting him. Voorhees on Arrest, sec. 197. Many authorities say it is murder if death results. The officer must not use unnecessary force in making the arrest, and if he does so it is at his peril. These well settled principles would apply with much greater reason where an innocent traveler on the highway is not even sought to be arrested, but to be detained for examination. This instruction would tend to lead the jury to understand that the law would justify the defendant in using force necessary to cause Dr. Coffindaffer to pause for the purpose of being investigated. The force used was the firing of the shots, one of which almost caused death. Even this force was not sufficient to cause him to pause, on the contrary it caused him to flee for his life. The instruction would, if given, have tended to justify the offense charged. Under this evidence the instruction was misleading, and properly refused. It is argued that if an officer can break a door to enter a dwelling house in order to search for a criminal supposed to have taken refuge therein, then like

force can be used to stop and enter an automobile and make search. But before an officer can break the doors and enter a dwelling house to make an arrest, he must first make due demand as an officer armed with authority, and a refusal would not justify the taking of life. The controlling feature on this question in this case is, not what might have been done, but what was actually done.

Shooting with firearms by officers in pursuit of fugitives charged with minor crimes, as a ruse to prevent further flight, is illegal as a reckless use of firearms, and was disapproved in *State* v. *Cunningham,* 65 So. 115, where the court said "an officer must not intentionally shoot a misdemeanant who is a fugitive, nor must he discharge a firearm while in pursuit, in such manner as to cause such fugitive injury."

Exception is made to the ruling of the court in not allowing the witness John Siers to detail information he had received from A. L. Lohm, a federal officer, to the effect that Costa was a dangerous character and would likely resist arrest, and would attempt to run over the officers with his automobile. And also that Costa was expected to come through the bridge that night; and that he, Siers, had informed the defendant of what had been told him in that regard by Lohm. Also that the court refused to allow the warrant to be put in evidence which witness had as a special officer for Costa for violation of the prohibition law. The record discloses that practically all of this evidence went to the jury in another form. The defendant testified that he was requested by Siers to help him make an arrest of a man who was coming in with liquor. "He (Siers) said he (Costa) was a bad man and he did not feel like going after him alone; he wanted some assistance, and I felt it was my duty to do so, and I did." Ques. "Was that man Joe Costa?" Ans. "Joe Costa." Ques. "At the time you went down to the bridge did you know, or had you learned that this fellow Joe Costa, was a bad man and would likely resist arrest?" Ans. "I did." Siers also testified that he had a warrant for Joe Costa at the time he went to the bridge, and requested the defendant and Mr. Darnell to accompany him to assist in making the arrest, and that they were all at the bridge for that purpose. The informa-

tion which Siers had received from Lohm went to the jury, and
the prisoner received the benefit of it. The fact that Siers had a
warrant for Costa went to the jury and it is not perceived how
the warrant itself, if introduced to the jury, would have
strengthened that fact. Moreover it is apparent that the jury
gave the defendant the benefit of this evidence. It did not find
him guilty of malicious shooting. The object of that evidence
was to repel the presumption of malice in the use of the deadly
weapon, and the reason why the defendant was at the bridge.
Malice was successfully eliminated. The verdict was for unlaw-
ful wounding. The error, if any, in refusing to allow Siers to
give this evidence, (which in fact went to the jury in another
form) was harmless, in view of the verdict. *State* v. *Miller,* 85
W. Va. 326, 102 S. E. 303. Had Costa been in Dr. Coffindaffer's
place, the jury would have been justified in finding a verdict for
unlawful wounding. There is conflict in the evidence as to the
actual shooting. All of the occupants of the car, four in number,
testify that the shot which wounded the doctor was fired by a
man standing immediately to the right of the car and within
four or five feet of the doctor, and that he pointed his pistol
directly at, and in line with, the doctor's shoulder. The doctor
felt the burn on his neck. The ball entered the posterior part
of his right shoulder close to the upper portion of the shoulder
blade, or scapula, and came out just beneath the collar bone,
which it broke, and lodged in his clothing. There was evidence
that a pistol ball had penetrated the rear tire on the left side
of the car, entering from the left side of the tire near the rim,
and, glancing upward, came out of the opposite side of the tire,
making a ragged hole. All of the occupants of the car testified
that the first shot came from the left side, the side where Siers
stood, and they heard the air go out of the tire, and immediately
afterwards the shot which wounded the doctor was fired from
the right by a man standing very close to the car, and in front
of the other car standing on that side of the bridge. This was
about the position which the defendant testified he occupied at
the time of the shooting. The defendant very frankly and
promptly stated that he had done all the shooting that was done
there that night and the other defendants make the same state-

ment.   As heretofore stated, the main conflict in the evidence
concerning the immediate shooting arises between the state-
ment of the witnesses that the shot was fired directly into the
back of the doctor from a man on the right and the statement
of Boggs that the shots were not fired until after the car had
passed him.   The physical fact that the doctor was shot in the
right shoulder, and the range of the bullet directly through his
body, corrobrates the testimony of the State's witnesses.   These
questions of fact were passed upon by the jury and adversely
to the defendant.   It was within the province of the jury under
this testimony to say that the defendant either did the act
maliciously or unlawfully.   The jury was instructed by defend-
ant's instruction No. 1 on the question of malice.   That instruc-
tion reads as follows:   "The court instructs the jury that the
defense of accidental injury to Dr. Coffindaffer goes to the very
gist of the charge and denies all criminal intent, and throws
the burden of proving the intent, as charged in the indictment,
beyond a reasonable doubt, upon the State.     Therefore, al-
though you may believe that the defendant Boggs did shoot
and wound Dr. Coffindaffer, yet unless you believe beyond all
reasonable doubt that such shooting was done with intent to
maim, disfigure, disable and kill him, you must find the de-
fendant not guilty of the malicious and unlawful shooting."
This instruction put before the jury the full theory of the de-
fense, and it may be that the result was the best for the de-
fendant that he could expect under the circumstances.   At least
the jury so disposed of the case and it is not within the province
of this court to gainsay it.

Exception was made to the ruling of the court in refusing to
permit Dr. Coffindaffer to state on cross-examination a conver-
sation between himself and two men who passed him on Gypsy
hill, a place about  a mile from  the bridge  and between
Shinnston and the bridge.    The doctor had stated on cross-
examination that he had passed two men at that point who
asked him if he had any whiskey and if so "you had better
not go ahead."    To which he replied:    " 'We haven't got any
whiskey, we have got a very sick woman,' and I said—I don't
know whether I said 'We are in a hurry' or not, and they began
to say something more, and I thought the fellows were drink-

ing and we just drove on." The defense then asked: "Now, Doctor, I want you to state what these parties said to you when they came to you, or when they drove *apast* you on the road before you reached the bridge." This question was objected to and the court sustained the objection because the witness had practically answered the question and because the court said it was not pertinent to the issue. There was another ground upon which this question was not proper. This was a cross-examination of the doctor and he had not testified to this matter on direct examination. As to this conversation between these witnesses the defense was making the doctor their own witness. He could have been recalled for that purpose when the defense put in its evidence. *State* v. *Hatfield,* 48 W. Va. 561.

Interrogatories were prepared by the defense and submitted to the jury, touching the questions of malice and the intention of the defendant in firing the shots, and were carried by the jury to their room, and afterwards and before they returned their verdict, on motion of the State, these interrogatories were withdrawn from the jury over the objection and exception of the defense, and this action of the court is insisted upon here as error. The statute allowing interrogatories is found in ch. 120 of the Acts of 1882, and is sec. 5 of chap. 131 of the Code, which chapter relates to trials in civil cases. There is no reference to propounding such interrogatories in ch. 159 of the Code, which relates to the trial of criminal cases. The statute is as follows: "A circuit court may in any case before it, other than a chancery case, have an issue tried, or an inquiry of damages made by a jury, and determine all questions concerning the legality of evidence and other matters of law which may arise. Upon the trial of any issue or issues by a jury, whether under this section or not, the court may on motion of any party, direct the jury, in addition to rendering a general verdict, to render separate verdicts upon any one or more of the issues, or to find in writing upon particular questions of fact to be stated in writing. The action of the court upon such motions shall be subject to review as in other cases. Where any such separate verdict or special findings shall be inconsistent with the general verdict, the former

shall control the latter, and the court shall give judg-
ment accordingly." It is at once apparent from the context
that these interrogatories were intended to be used only in
the trial of civil cases. On this question Judge Cooley says;
"How far the jury are to judge of the law as well as of the
facts, is a question, a discussion of which we do not propose
to enter upon. If it be their choice to do so, they may return
specially what facts they find established by the evidence, and
allow the court to apply the law to those facts, and thereby
to determine whether the party is guilty or not. But they are
not obliged in any case to find a special verdict; they have a
right to apply for themselves the law to the facts, and to ex-
press their own opinion, upon the whole evidence, of the de-
fendant's guilt." Cooley's Const. Lim. (7th Ed.) p. 461.
"Statutes permitting findings to be required in response to in-
terrogatories are held not to apply to criminal cases, for the
reason that to so apply them would be to impair the right of
trial by jury secured by the Constitution. It is one of the
most essential features of the right of trial by jury that no
jury should be compelled to find any but a general verdict in
criminal cases, and the removal of this safeguard would violate
its design and destroy its spirit.

"But though the jury cannot be compelled to answer spec-
ially, it is undoubtedly at liberty to include special findings
in its verdict." Clementson on Special Verdicts, p. 49. See
also *People* v. *Roat,* 117 Mich. 578; *People* v. *Marion,* 29 Mich.
31; *Maiden* v. *The Commonwealth,* 82 Ky. 133; *Smith* v. *State
of Ohio,* 59 Ohio St. 350; *State* v. *Fooks,* 65 Ia. 196.

This law has been on our statute books for 38 years and it
has never been considered as applying to criminal cases by
either the bench or the bar. This fact could be considered in
the interpretation of the application of this statute if it were
necessary. "A construction of a statute that has been acted
upon by the bench and bar for nearly half a century should not
be disturbed. The common consent and opinion of the legal
profession on a question of the construction and practical opera-
tion of a statute were held to be of persuasive force." Lewis'
Sutherland Statutory Construction (2nd Ed.) vol. 2, p. 887.

As above intimated, we are of the opinion that special inter-

rogatories cannot be propounded to the jury in criminal cases and we see no error in the action of the trial court in withdrawing these interrogatories from the jury.    In the first place they should not have been submitted to the jury.

This is a most unfortunate case, both for the defendant and for Dr. Coffindaffer.    The defendant is only 26 years of age and for nearly two years he was with the American Expeditionary Forces in Europe, and his services were acknowledged by decorations for gallantry on the battlefield.    Possibly his military training impelled him to act over hastily when the occupants of the car refused to heed the command of "halt." Possibly the influence of army life and the incidents of the battlefield made it more difficult for him to heed the civil requirements in making arrests.    While his punishment may be severe under all the circumstances, this court, perceiving no error in his trial, can give him no relief.

The judgment of the lower court is affirmed.

*Affirmed.*