75 N.J. Super. 584 (1962)
183 A.2d 691
MERRITT WIMBERLY, SR., AS GENERAL ADMINISTRATOR AND AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF JAMES WIMBERLY, PLAINTIFF-APPELLANT,
v.
CITY OF PATERSON, A MUNICIPAL CORPORATION OF NEW JERSEY, AND JOHN M. DOCHERTY, JR., AND PETER KLIKIER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1961.
Decided July 24, 1962.
*590 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. David Cohn argued the cause for appellant (Messrs. David & Albert L. Cohn, attorneys; Mr. David Cohn and Mr. Daniel Crystal on the brief).
Mr. Adolph A. Romei argued the cause for the respondents (Mr. Theodore D. Rosenberg, attorney).
*591 The opinion of the court was delivered by LABRECQUE, J.S.C. (temporarily assigned).
The plaintiff Merritt Wimberly, Sr. appeals from a judgment of dismissal following a jury verdict of no cause for action in the Superior Court, Law Division. He further appeals from an interlocutory order denying his motion for summary judgment as to liability and from the denial of his later motion for a new trial.
Plaintiff sues as general administrator and as administrator ad prosequendum of the estate of his son, James Wimberly, who met his death on March 8, 1959 as a result of a bullet fired from the pistol of defendant Docherty. As representative of the next of kin, he sues to recover damages for the wrongful death of the decedent. As administrator of decedent's estate, he seeks damages for his pain and suffering during the short period between the shooting and his death.
At the time of the shooting Docherty was a police officer of the City of Paterson, and he and a fellow police officer, Peter Klikier, were attempting to apprehend the decedent. The latter, then aged 17 years and 5 months, had been attending an evening basketball game at the Paterson armory. There Klikier recognized him as one wanted by the police department. They stopped him and demanded that he identify himself. He told them his name was Bates and that he was 19 years of age. He was thereupon told that he was being taken into custody as a parole violator. He was, in fact, on parole from the Jamesburg State Home for Boys, to which he had been committed in 1957 and from which he had been released in April 1958. The officers knew of no outstanding complaints or warrants for his arrest and no indictments were pending against him. The only authorization on which they were acting was an informal instruction from a superior police officer, Detective Sgt. Ventimiglia, to pick up the decedent as a parole violator and for questioning on suspicion, "if you happen to see him."
The two officers took Wimberly to the door of the armory *592 where they were joined by a Sgt. Tanis, also of the Paterson police. Suddenly he pushed Klikier aside, bolted from the armory and began to run north on Pennington Street, with Klikier, Docherty and Tanis in pursuit. In the initial phase of the chase, Klikier fired a warning shot in the air. He was then passed by Docherty who fired two additional shots in the air. When he reached a point near the entrance to an alley, the decedent fell but picked himself up and ran into the alley.
The alley was approximately 4 feet wide and 36 feet long. Docherty testified that when he reached it, he shouted "halt" and upon receiving no answer he fired one shot down the left side of the alley at a patch of light on the ground, some 20 or 30 feet distant. He asserted that he intended it to be a warning shot but was afraid to fire into the air because it was dark and a bullet might have entered a house. The bullet struck the decedent, fatally wounding him.
Docherty, who had been on the Paterson police force for some three years, was an expert marksman and a member of the police pistol team. He had previously served for three years in the Marine Corps. He testified that when he went into the alley after firing the shot, the decedent grabbed his legs and pulled him down so that he and Klikier had to subdue him. Decedent was subsequently taken to the hospital in a patrol wagon, both officers stating that he continued to struggle. However, this was disputed by some of the decedent's friends who asserted that he was limp. In any event he died a very short time after reaching the hospital. The record is not clear as to whether he was hit directly or whether the bullet ricocheted.
The grounds of appeal urged may be generally classified as follows: (1) error in the failure of the trial court to enter summary judgment or to direct a verdict in favor of the plaintiff as to liability; (2) improper and prejudicial remarks in summation by counsel for the defendant; (3) errors in the admission of evidence; (4) errors in the charge; (5) refusal to grant a new trial for the foregoing *593 reasons, and (6) that the verdict was contrary to the evidence and the result of passion, prejudice, partiality or mistake.

I.
Plaintiff's basic contention in respect of the first contention is that as a matter of law the officers had no right to use firearms in attempting to arrest the decedent, a 17-year-old juvenile charged with nothing more than parole violation and under suspicion of having committed other offenses. Noback v. Town of Montclair, 33 N.J. Super. 420 (Law Div. 1954). He asserts that the City of Paterson was liable for their actions under the doctrine of respondeat superior and that upon the undisputed facts summary judgment should have been entered as to liability. McAndrew v. Mularchuk, 33 N.J. 172 (1960). A motion for summary judgment to that effect was made and denied. At the completion of the eight-day trial, a motion for a directed verdict as to liability was made and denied.
In opposition to the motion, it was urged that the shot had been fired as a warning only, in an effort to halt decedent's flight and not with intent to strike or harm him. The court held that it was for the jury to determine whether the shooting was intentional, or whether it resulted from the negligent firing of a warning shot by Docherty.
The question presented is restricted to whether a police officer may, if in the exercise of due care, fire a warning shot where an unarmed juvenile is sought to be taken into custody for an alleged parole violation, or for questioning as a suspect in connection with the investigation of past offenses not committed in the presence of the arresting officer. The plaintiff, relying upon the reasoning of the court in Noback v. Town of Montclair, supra, at p. 427, and Davis v. Hellwig, 21 N.J. 412 (1956) (affirming 37 N.J. Super. 569 (App. Div. 1955)), asserts that no such right exists. He further contends that, regardless of the motive which may have actuated Docherty, the firing by *594 him, at close range into the narrow passageway where he knew or should have known his quarry must be, evinced such a reckless disregard of consequences as to require a peremptory finding of liability.
The rule is well established that a police officer in effecting an arrest has the right to use such force as he feels reasonably necessary, being responsible, however, for the use of any excessive force, or for the wanton abuse of discretion in determining the amount of force reasonably required to effect the arrest. Antwine v. Jones, 14 N.J. Super. 86, 88 (App. Div. 1951); Restatement, Torts, §§ 131 (1948 Supp.), 132, 133 (1934). If resistance to lawful arrest is encountered, the officer may repel force with force even to the extent of killing the offender if that extremity becomes necessary to effect the arrest or to protect himself from serious bodily injury. Noback v. Town of Montclair, supra, at p. 427; 2 Bishop, Criminal Law (9th ed.), §§ 647(1) and 650. Likewise, following the common law rule, a police officer has been held justified in shooting or killing an escaping felon either before or after an arrest if the offender could not otherwise be captured. Noback v. Town of Montclair, supra, p. 427; Commonwealth v. Duerr, 158 Pa. Super. 484, 45 A.2d 235 (Super. Ct. 1946); Charge of Justice Depue to the Essex County Grand Jury, 9 N.J.L.J., 167-169 (1886); Davis v. Hellwig, supra, p. 416.
But a fleeing offender who is charged with a misdemeanor, as distinguished from a common law felony, or with a breach of the peace or a violation of the Disorderly Persons Act, falls into an entirely different category, and a police officer who shoots at such an offender subjects himself to civil liability as well as criminal prosecution. Davis v. Hellwig, supra; cf. State v. Williams, 29 N.J. 27, 37 (1959). In Davis, the court pointed out the reasons underlying this distinction by quoting from the opinion of the North Carolina Supreme Court in Holloway v. Moser, 193 N.C. 185, 136 S.E. 375, 50 A.L.R. 262 (1927) as follows:
*595 "By the common law, an officer, in a case of felony, was permitted to use all force necessary to capture the felon, even to slaying him when in flight. In the case of a misdemeanor, however, the rule was different. The officer could defend himself, if resisted, even to the taking of life, but if the offender were simply fleeing and not resisting, he had no right to kill. It was thought that to permit the life of one charged with a mere misdemeanor to be taken, when not resisting but only fleeing, would, aside from its inhumanity, be productive of more evil than good.
The reason for the distinction was obvious. Ordinarily, the security of person and property is not endangered by a misdemeanant being at large, while the safety and security of society require the speedy arrest and punishment of a felon.

* * * * * * * *
It is universally held that an officer has no right to kill one who merely flees to avoid arrest for a misdemeanor or to effect an escape from such arrest, even though it may appear that by no other means can the accused be taken or recaptured. * * * It is better that he be permitted to escape altogether than that his life be forfeited, while unresisting, for such a trivial offense.

* * * * * * * *
`* * * The accused is shielded in that event, even from an attempt to kill with a gun or pistol, by the merciful rule which forbids the risk of human life or the shedding of blood in order to bring to justice one who is charged with so trivial an offense, when it is probable that he can be arrested another day and held to answer.'"
In the instant case, the fact that decedent was a juvenile did not exempt him from lawful arrest. State v. Smith, 32 N.J. 501 (1960). He was subject to arrest for a misdemeanor or for disorderly conduct committed in the officers' presence or where they had reasonable cause to believe a high misdemeanor had been committed and suspicion attached to him. State v. Smith, supra, at p. 531.
But the fact that he was wanted for questioning on suspicion that he might have committed other offenses afforded no ground for shooting at him when he sought to flee. Commonwealth v. Duerr, supra; cf. Davis v. Hellwig, supra. Likewise, the fact that he was sought as a parole violator did not render the shooting justifiable. The procedure for retaking and detaining a parole violator is fully set forth in the statute. N.J.S.A. 30:4-123.22. Only the *596 Parole Board may revoke a parole, although in a case of immediate emergency a parolee may be arrested as delinquent on parole prior to its actual revocation. Ibid. Parole revocation is not a separate offense but involves the loss of the privilege to be at large. Relatively minor reasons may result in the revocation of parole.
Nor did the alleged assault by decedent on Klikier justify the use of firearms in order to bring him down. It cannot be said that it constituted an atrocious assault and battery. N.J.S. 2A:90-1; cf. State v. Riley, 28 N.J. 188, 197 (1958). The inescapable conclusion from the testimony was that Wimberly had merely pushed Klikier aside in making his escape. At best, it involved no more than a simple assault, a violation of the Disorderly Persons Act. N.J.S. 2A:170-26. Nor was the shooting of decedent justified by the fact that he had escaped from arrest or was seeking to do so. Such an offense is likewise denominated a misdemeanor. N.J.S. 2A:104-6. We thus come to consideration of whether the trial court properly drew a distinction between warning shots and shots consciously directed at a fleeing offender, and left to the jury the question of whether negligence in the firing of such warning shots had been established.
Our courts have universally regarded loaded firearms as dangerous instruments and have prescribed an elevated degree of reasonable care and caution to be exercised in their use. Davis v. Hellwig, supra, at p. 415; Moebus v. Becker, 46 N.J.L. 41, 44 (Sup. Ct. 1884). But we are unable to conclude, from any of the cases cited by plaintiff, or from our own independent research, that it has ever been held in this State that "warning shots," i.e., those not consciously directed at a fleeing offender or his conveyance but designed to prevent further flight, may not be fired where reasonable care is exercised in so doing.
In Davis v. Hellwig, supra, relied upon by plaintiff, the policeman testified that he had aimed and fired at the legs of the fleeing offender. The bullet was deflected and struck *597 the plaintiff, a passerby. The suit was pleaded and tried on the sole theory of negligence. The police officer had been under the mistaken belief that the escapee was a felon where as the value of the goods stolen rendered the offense a misdemeanor only. Even though it was conceded that the shot was actually aimed so as to strike the legs of the fugitive, the Supreme Court declined to hold that the issue of liability was a question of law. On the contrary, it held:
"There is no evidence in the instant case to show what caused the bullet to be deflected to the north sidewalk where the infant plaintiff was walking. But even though the defendant, in Mr. Justice Cardozo's words, is held to a `duty of prevision not far from that of an insurer,' it does not follow that the court is to decide the issue of liability as a question of law. * * *" (at pp. 419-420)
In McAndrew v. Mularchuk, supra, Mularchuk, a special policeman, testified that after he and another policeman had arrested a group of young men the plaintiff McAndrew and two others started walking towards him making threats. He ordered the plaintiff to halt. The order was disobeyed and plaintiff kept advancing, putting his right hand into his pocket as he did so. Mularchuk thereupon drew his gun and shot at the sidewalk "towards him to scare him off." The shot took effect and the suit followed. On appeal it was held (33 N.J., at 189-190).
"If Mularchuk fired at the sidewalk to warn or to effectuate the arrest of his purposed prisoner, without intending to hit him, but aimed so close or so inaccurately that the bullet either struck him directly or by ricochetting from the sidewalk, manifestly a finding of a negligent act of commission would be justified. * * *" (Emphasis added)
Nowhere in the opinion of the court is there any suggestion that the issue of Mularchuk's asserted negligence should have been disposed of by the court as a matter of law. In Noback v. Town of Montclair, supra, the officer conceded that, while he did not intend to take the plaintiff's life, he *598 did intend to maim him and bring him down by shooting at his leg.
The decisions of our sister states are not in agreement. Typical of decisions cited by plaintiffs which are said to preclude the firing of warning shots are State, to Use of Johnson v. Cunningham, 107 Miss. 140, 65 So. 115, 51 L.R.A., N.S., 1179 (Sup. Ct. 1914); State for Use of Holmes v. Pope, 212 Miss. 446, 54 So.2d 658 (Sup. Ct. 1951). Other cases on which they rely are readily distinguishable. Thus in Edgin v. Talley, 169 Ark. 662, 276 S.W. 591, 42 A.L.R. 1194 (Sup. Ct. 1925), the officer fired at the automobile in which plaintiff was riding, and in State v. Boggs, 87 W. Va. 738, 106 S.E. 47, 18 A.L.R. 1360 (Sup. Ct. App. 1921), the policeman's shots were directed at the tires of the automobile in which the wounded man was riding. Other cases hold that the use of firearms merely to frighten a misdemeanant into submission does not constitute an assault, provided the shooting is not negligently done. 6 C.J.S. Assault and Battery § 97(c), p. 956; Hutchinson v. Lott, 110 So.2d 442 (not officially reported), (Fla. D. Ct. of App. 1959); People v. Lathrop, 49 Cal. App. 63, 192 P. 722 (D. Ct. App. 1920). In Hutchinson v. Lott, the court stated:
"* * * a review of the decisions from other jurisdictions leads us to the conclusion that the accepted rule is that when a misdemeanant flees to avoid an arrest an officer is justified in firing shots to effect the arrest as long as he has no intention of shooting the law breaker. This rule recognizes as proper the action of officers in discharging firearms into the air as a ruse to prevent further flight. * * *" (at p. 444)
We hold the sound rule to be that a police officer may discharge a firearm in order to frighten into halting, one attempting to escape from a lawful arrest, being accountable, however, for such negligence in so doing as results in injury to the fugitive. In such a case it is for the jury to determine whether there was negligence by the officer. *599 Here the evidence was in dispute. If that on behalf of defendants was believed, it established that there was no intention to strike or otherwise harm the decedent, and that the sole object was to frighten him into surrendering. While it may well be argued that the factual situation weighed heavily in favor of the hypothesis that the shooting was intentional, the proofs were not sufficient to call for the withdrawal of the issue of liability from the jury. On the contrary, the jury could have found that when Docherty aimed to the left at the spot of light in the alley-way which, he asserted, appeared to be clear, he had reasonable cause to believe that the shot would strike this target and not the decedent who, it turned out, had been on the right side of the alley.
The possibility of such a finding in defendants' favor likewise precluded the granting of plaintiff's motion to direct a verdict in his favor as to liability on the ground of negligence. In passing upon such a motion the court was required to consider as true all evidence contrary to the motion which had been produced on the part of the defendants, and to give to them the benefit of all reasonable inferences therefrom. If, in the face of such evidence, reasonable men could have honestly differed as to the inferences to be drawn, the case was for the jury rather than the court. Gottfried v. Temel's Restaurant, Inc., 69 N.J. Super. 163 (App. Div. 1961); Cafone v. Spiniello Construction Co., 42 N.J. Super. 590 (App. Div. 1956). In Davis v. Hellwig, supra (21 N.J., at p. 420), on which plaintiff heavily relies, the court quoted from Moebus v. Becker, supra, as follows:
"`The cases in which the question of negligence can thus be withdrawn from the jury are said to be comparatively rare * * *. So great is the reluctance to take the question of negligence from the jury, as a mixed question of law and fact, that the current of decision is that not only should the facts be undisputed, but the conclusions to be drawn from those facts must also be indisputable * * * it was a question of fact for the jury to determine, whether the defendant was guilty of negligence, or whether the shooting *600 of the plaintiff by him was the result of an unavoidable accident, and was wholly without fault on the part of the defendant.' 46 N.J.L. 43, 45."
As has been pointed out, in Davis the police officer admitted firing the shot at the escaping thief and striking a pedestrian, in daylight, in a very narrow street at a time when there undoubtedly would be pedestrians, without making observation for them beyond looking to see whether any of them were in the direct line of his fire. In the instant case, the accident occurred at night and the defendant Docherty disavowed any intention of striking the decedent.
While we thus hold that police officers are not precluded from firing warning shots in a proper case when this is done in the exercise of reasonable care, we reiterate that the law imposes a duty to employ extraordinary care in the handling and use of firearms in such a situation. McAndrew v. Mularchuk, supra (33 N.J., at p. 183). One who resorts to the use of warning shots is held to a "duty of prevision not far from that of an insurer." Davis v. Hellwig, supra (21 N.J., at pp. 415-416).
Accordingly, the trial court properly left to the jury the question of whether the shooting was intentional or was the proximate result of negligence on the part of Docherty, for which his fellow officer could have likewise been held liable if it was found that he participated therein. The question of the responsibility of the defendant City of Paterson, either upon the theory of the city's personal active wrongdoing in authorizing the use of revolvers by the defendant officers without any training or without adequate training relative to how and on what occasions and under what circumstances to use the same, or under the doctrine of respondeat superior for the negligent act of commission of Docherty and his fellow officer in the performance of their police duty, was likewise for the jury. McAndrew v. Mularchuk, supra (33 N.J. 172, 196).

*601 II.
We next turn to consideration of the plaintiff's charge that, assuming that the liability of defendants was for the jury, he was not accorded a fair trial. In support of this contention he refers to the defendants' summation, to the admission of allegedly inadmissible evidence and to errors of commission and omission in the charge.
We are satisfied from our reading of the defendants' summation that the plaintiff was denied a fair trial. The principal issue in the case was whether Docherty intentionally fired the shot or was negligent in the manner in which he did so. However, counsel for the defendants, in summation, attempted to turn the case into a trial of the decedent for various offenses committed in and around Paterson and Passaic, and into an indictment of the morals of the plaintiff administrator.
At the beginning of the summation appears this introduction:
"Now, ladies and gentlemen of the jury, during the course of this trial it has become necessary for us to show the true character of the decedent, and I assure you that we did so most reluctantly, but we had no choice, because the character and the traits of the decedent are directly in issue here, and in order for you to make a determination as to whether or not the defendants properly exercised their judgment, it is necessary for you to know what type of person they were dealing with." (Emphasis added)
No more effective means could have been devised to divert the jury from performance of its sworn duty. The trial court had permitted the introduction of what it considered to be evidence of decedent's character as bearing on the question of damages only. The defendants proceeded to utilize this testimony as justification for the shooting itself and continued to do so throughout the summation  and this in spite of the fact that the defense was that the shooting was accidental. Thus counsel accused the decedent of being "hardened" and "uncooperative," of being "unruly," *602 of being "spiteful," of being a "desperate criminal." The jury was further told that decedent
"* * * had something he was concerned about; there is no question, and there can be no question in your minds, ladies and gentlemen, that he had committed something very serious or he would not have run from the police officers, in view of the fact that they were firing warning shots at him."
This involved a covert suggestion that the defense had evidence of other crimes committed by decedent, cf. State v. Ferrell, 29 N.J. Super. 183 (App. Div. 1954), especially when considered in connection with the allowance of testimony as to other crimes which decedent was suspected of having committed.
The jury was further told:
"But what would be the result of your making an award to his father under these circumstances? Ladies and gentlemen, it would encourage lawlessness. It would encourage police officers not to use their weapons if they are going to be subjected to a law suit every time they endeavor to apprehend a dangerous criminal, especially one who was constantly on the run." (Emphasis added.)
And further:
"Where was James Wimberly headed? Perhaps some innocent person might have been murdered. Think about that; very important in this case." (Emphasis added.)
Likewise, in the summation there was persistent and constant recourse to attacks upon the plaintiff, decedent's father. Although he sued only in a representative capacity, counsel for the defendants endeavored to leave with the jury the impression that any recovery would go to him and that they would thus be rewarding one who had neglected his family, failed to bring his son up properly, and had otherwise been a bad citizen. He was accused of abandoning the decedent at the age of two years and of having neglected to support him thereafter. It was suggested *603 that he had left his wife and that they had become estranged. Thus:
"* * * We repeatedly asked, `Do you live with your wife?' `Do you take care of your wife?' `Yes.' `Who pays the rent?' `I pay the rent.' `How much is the rent?' `$84 a month.' `Have you ever left your wife?' `No.'" (Emphasis added.)
And:
"Ladies and gentlemen of the jury, I charge that the death of James Wimberly was due to his upbringing, the upbringing given by the father. I feel sorry for his mother who sat here in the courtroom. I think you observed during the course of this trial  I think you observed both of them. What was the relationship between the mother and the father? Did they ever speak to one another? I never saw them speak to one another. I am sure you observed the same thing." (Emphasis added.)
The jury was told that the plaintiff had done nothing to keep the decedent out of trouble or to rehabilitate him.
It was further told:
"I charge that Mr. Wimberly, Mr. Merritt Wimberly, sitting right there, is seeking to capitalize on the death of his son. Had he been interested in his son, he would have done something before this happened. This is a direct result of Mr. Wimberly's upbringing."
And further:
"But more significant than anything else is the fact that here we have a father who has actually deserted his family. This is the man who comes into Court and asks for damages for the loss of his son."
And further:
"This is the man who seeks a reward for what his son did. Are you to reward James Wimberly, James Wimberly's father? You cannot do anything for James Wimberly anymore."
And further:
*604 "Would this have happened had Mr. Wimberly performed his job as a father? I say no. You think about that.
Ladies and gentlemen, if you give an award to Mr. Wimberly, you are giving a bounty for lawlessness. You are giving a reward for James Wimberly, type of people like James Wimberly. I need not tell you what type of world we live in today. I need not tell you that crime is on the increase, and you know that."
And finally:
"* * * Consider what pecuniary benefit has been lost by Mr. Wimberly, a man who is not living with his family at present. Consider that. Consider why he brought the suit; why wasn't his wife a party to the suit? Think about that." (Emphasis added.)
The basic unfairness of this final appeal to the passions is accentuated by the fact that counsel was charged with knowledge that the only permissible party was the administrator ad prosequendum and that the action was brought not only on behalf of the father but on behalf of the mother and the surviving brothers and sisters of the decedent.
Counsel in his summation is allowed wide latitude. He may argue from the evidence to any conclusion which the jury is free to arrive at. He may draw conclusions although such inferences are improbable, illogical, erroneous, or even absurd, unless they are couched in language transcending the bounds of legitimate argument or there are no grounds for them in the evidence. Botta v. Brunner, 42 N.J. Super. 95, 108 (App. Div. 1956), modified in 26 N.J. 82 (1958); Vorhies v. Cannizzaro, 66 N.J. Super. 551, 558 (App. Div. 1961). Here, counsel for the defendants engaged in the misuse of evidence concerning the decedent's asserted moral qualities  evidence which had been introduced and allowed solely as bearing on the question of the quantum of damages. Such misuse was equivalent to referring to testimony which was not in the case.
Nor did the highly improper remarks of the defendants' counsel with reference to the morals of the plaintiff administrator bear relation to any issue in the case. We have held *605 that such an attack by counsel upon a litigant's character or morals, when they are not in issue, is a particularly reprehensible impropriety. Paxton v. Misiuk, 54 N.J. Super. 15, 22 (App. Div. 1959). The remarks made invited the jury to judge the decedent's claim not upon the law applicable but rather upon whether his father lived up to the jurors' standards for the behavior of a moral married man. Id. We have no doubt as to the prejudicial effect of these remarks. It is difficult to conceive why they were made if such a result was not intended. Haid v. Loderstedt, 45 N.J. Super. 547, 551 (App. Div. 1957); Paxton v. Misiuk, supra, at p. 23.
But it is urged that counsel for the plaintiff did not object to these passages, either during the summation or immediately thereafter. We note that there is no indication on the record that any specific objection was interposed at either time. When an improper remark is made by counsel in the course of summation, it is the duty of the party aggrieved to immediately voice his objection to the court and if the remarks have been of such a nature as not to be rectifiable by further instructions, then to make a motion for a mistrial. McCray v. Chrucky, 66 N.J. Super. 124, 134-135 (App. Div. 1961). He cannot for tactical reasons allow objectionable remarks or conduct to pass unnoticed and subsequently claim injury therefrom. Id.
However, plaintiff claims that his counsel made no objection immediately upon the making of the comments because of a direction by the trial court at the beginning of summation not to:
"* * * interrupt one another unless you feel it's absolutely necessary."
This admonition by the court certainly did not preclude the making of proper objections to counsel's remarks. However, plaintiff explains that throughout the trial his counsel had been constantly objecting to the introduction of allegedly illegal testimony, some of which formed a basis for the *606 improper remarks by defendant on summation, and that rather than interrupt his opponent and incur the further risk of the jury's ire, he prepared and submitted a series of supplementary requests to charge, seeking to overcome the prejudicial effect of any remarks in summation addressed to the allegedly objectionable testimony. He asserts that these were accepted by the court and that three of such requests were actually charged. Such procedure would have been proper had the remarks been made in the absence of the trial judge. McCray v. Chrucky, supra, at p. 135.
Plaintiff further claims that his counsel did, in fact, object to the summation at its conclusion but that the reporter stopped taking notes so that his objection does not appear in the transcript. There are some indications elsewhere in the transcript which support this explanation. (See pp. 1008a, 1107a, 1108a)
We find it unnecessary to consider whether plaintiff's trial procedure as described, constituted the making of adequate objections to the remarks referred to, under the circumstances here presented since we are convinced that the improprieties were so gross and unwarranted and had such an unmistakably prejudicial impact upon the plaintiff's case as to call for invocation of the plain error rule. R.R. 1:5-3(c). The tactics employed so pervaded the proceedings to the probable detriment of the plaintiff that the verdict cannot be allowed to stand. Haid v. Loderstedt, supra; Paxton v. Misiuk, supra. In the latter case counsel had referred to the association of a party to the suit with a woman other than his wife. Although the specific remark was withdrawn by counsel, this court held that the trial judge was nevertheless required to instruct the jury to disregard the improper remarks of counsel in summation "in direct, strong terms, explaining forcefully to the jury that counsel's remarks were improper and why." (at p. 23)
We appreciate the fact that a trial judge is frequently reluctant to take a greater part in the trial of a case than is absolutely necessary, but it is the court's duty *607 to confine counsel to legitimate argument, especially where, as here, such action is rendered necessary in order to prevent the perversion of law and justice. Cf. Purpura v. Public Service Elec. & Gas Co., 53 N.J. Super. 475 (App. Div. 1959). Isolated remarks of an improper nature may easily escape the attention of the trial judge and thus the need for a proper objection is generally imperative if correction is to be made. Here, however, a great part of the defendants' summation was buttressed upon the misuse of evidence and an appeal to the passions of the jury. The trial judge did not interrupt, however, apparently preferring to handle the matter in his charge.
Our examination of the charge does not support the conclusion that it was adequate to relieve against the prejudice which had been thus created. We incline to the view that the impact was too great, the imprint too deep, the influence too persuasive, in any event, to be erased by the court's directive. State v. Caccavale, 58 N.J. Super. 560, 574 (App. Div. 1959). The dead boy was virtually placed on trial for unspecified crimes. The appeal to the jury was to the effect that they should find that he deserved to die because of his background and his father's asserted derelictions. Substantial justice calls for a reversal.

III.
While our conclusion is for reversal without regard to the remaining grounds of appeal, nevertheless, since the case must be retried and a number of them involve rulings by the trial court relating to the admission or rejection of evidence, we turn to their consideration.
Plaintiff asserts that it was error for the trial court to refuse to allow the jury to view the scene of the shooting. A ruling on such matters is generally within the discretion of the court and will not be disturbed, absent an abuse thereof. Braelow v. Klein, 100 N.J.L. 156 (E. & A. 1924); Lorgan v. Palmer, 8 N.J. Misc. 205 (Sup. Ct. 1930); 3 Wigmore, Evidence (3d ed. 1940), § 1164, pp. *608 277-280; cf. State v. Pisano, 33 N.J. Super. 559, 565 (App. Div. 1955). From our examination of the record it does not appear that the trial court abused its discretion in declining plaintiff's request. Almost two years had passed since the shooting. The scene was such as to be capable of accurate portrayal both by oral description and by photographs. A photograph received in evidence afforded the court and jury a clear picture of the alley and adjacent buildings. It had been described by a number of witnesses. Nothing substantial would have been gained by suspending the already lengthy trial to permit a view of the premises by the jury.
Error is also asserted in the court's refusal to receive in evidence certain articles of clothing which were identified as having been worn by the decedent at the time of the shooting. Rulings on such matters are generally within the discretion of the trial judge. State v. Wise, 19 N.J. 59, 98 (1955). Ordinarily, any evidence which would aid the jury in the search for truth should be admitted. Miller v. Trans. Oil Co., 18 N.J. 407, 413 (1955); In re Richardson, 31 N.J. 391 (1960). Where appropriate or necessary, cautionary instructions limiting its evidential scope should be given. Dolan v. Newark Iron and Metal Co., 18 N.J. Super. 450, 456 (App. Div. 1952). Generally, however, remotely relevant evidence whose probative value is offset by the danger of undue prejudice to a party, may be excluded. Stoelting v. Hauck, 32 N.J. 87, 103 (1960). The discretion to exclude evidence under such circumstances should be exercised only when its probative value is clearly outweighed by the dangers its introduction would create. Id.; cf. Miller v. Muscarelle, 67 N.J. Super. 305, 318-319 (App. Div. 1961); Dolan v. Newark Iron and Metal Co., supra; McCormick, Evidence, § 152, pp. 319-320 (1954). In the case here presented the allowance in evidence of any bullet-torn or blood-stained articles of clothing could well have had a tendency to prejudice the jury against the defendants. On the other hand, the allowance *609 into evidence of articles of outer clothing might have been helpful to the jury in determining the degree of visibility which was presented by the decedent at the time of the shooting. We are unable to find that the trial court abused its discretion in rejecting the proffered evidence.
Complaint is also made concerning the use made at the trial of statements made by defendants Docherty and Klikier to the Paterson police during the investigation of the shooting. Such statements were clearly self-serving and would have been inadmissible if offered by the defendants. They likewise contained matter which was prejudicial to the decedent. However, they had been offered and allowed in evidence as plaintiff's exhibits. Not until he began to read the statements to the jury, some time after their receipt in evidence, did counsel for the plaintiff seek to omit the parts which he concluded to be prejudicial to his client's case. The trial court required that the entire statement be read and thereafter declined to grant plaintiff's motion to specifically instruct the jury to disregard the portions which plaintiff had sought to omit. These included a recitation that the decedent was suspected by the police of auto theft and burglary and that the police had previously taken him into custody for attempted rape.
In arguing against the motion, it was urged on the defendants' behalf:
"Mr. Romei: If the Court please, Mr. Cohn presented these statements as part of his own evidence, as part of his own case. He assumed the risk involved in it, involved in presenting these statements. They are now a part of his case, part of the record, and he is now bound by them. In any event, portions referring to burglaries, car thefts, and the commission of other crimes are material on the question of damages, to show the reputation of the particular individual involved and his propensities towards a life of crime."
We disagree. Where evidence otherwise relevant is received in evidence for the jury's consideration and it is made to appear that it may be improperly used, it should be accompanied *610 by cautionary instructions. Dolan v. Newark Iron and Metal Co., supra, 18 N.J. Super., at p. 456; Stein v. Schmitz, 137 N.J.L. 725, 726 (E. & A. 1948); Trenton Passenger Ry. Co. v. Cooper, 60 N.J.L. 219 (E. & A. 1897). In view of the nature of the criticized portions of the statements, the better practice would have been to delete such portions entirely. Alternatively, before the statements were read in full, the jury should have been given cautionary instruction as to their use. Simon v. Graham Bakery, 17 N.J. 525, 531 (1955); McCormick, Evidence, § 59, pp. 135-136 (1954); cf. Loria's Garage, Inc. v. Smith, 49 N.J. Super. 242, 249 (App. Div. 1958).
Complaint is also registered concerning a report made by Failla, one of the Passaic police officers who had arrested the decedent, which was permitted to be read to the jury by him on redirect examination. It is argued that the report which was entitled "Report of apprehension of four young colored men suspected of being responsible for five or six stickups in our city," contained matter which was inadmissible and was highly prejudicial to the decedent. It is urged by the defendants, however, that the introduction of the report was prompted by the plaintiff's cross-examination of the arresting officer in such a manner as to cast doubt as to whether he had included in his report all of the circumstances surrounding the incident. The report was permitted to refute any such inference reflecting upon the officer's credibility. The jury was cautioned as to its use and a portion of it was deleted. Control of the examination of witnesses, particularly on redirect examination, is a matter which must be left largely to the discretion of the court. We do not find that there was such an abuse of discretion here in view of the reference to the report in the cross-examination of the arresting officer. State v. Doro, 103 N.J.L. 88 (E. & A. 1926).
The plaintiff also complains of numerous asserted errors of the trial court involving the admission of testimony as to the past record of the decedent and as to dealings *611 with him by witnesses. In estimating damages accruing to the next of kin arising from the wrongful death of the decedent, the physical, mental and moral characteristics of the decedent and his likely earnings were factors and probabilities for the jury's consideration. McStay v. Przychocki, 10 N.J. Super. 455, 462 (App. Div. 1950), affirmed 7 N.J. 456 (1951); N.J.S. 2A:31-5; cf. Clifford v. McCloskey, 13 N.J. Super. 96 (Law Div. 1951). Obviously, evidence that the decedent had been committed to the Jamesburg Home for Boys was proper for the jury's consideration as to the future likelihood that he would have earned money and made contributions to his next of kin had he lived. Evidence of particular bad acts on his part would likewise be receivable in evidence to assist the jury in making this determination. I Wigmore, Evidence (3d ed. 1940), § 210(a), p. 709. But such evidence should be carefully screened so that in connection therewith there does not creep into the case testimony not relevant or bearing upon the issue of the moral characteristics of one who is not present to defend himself. In the case sub judice, four police officers of the City of Passaic were permitted to testify concerning the apprehension of the decedent approximately one month prior to his death. They testified that he denied his identity and falsely represented his age. Such testimony was admissible. During the course of their testimony, however, through questions which were overruled or through testimony which was stricken, or which the jury was directed to disregard, the jury was permitted to become aware of the fact that there had been various armed robberies in the City of Passaic; that the deceased was suspected of having participated in these and other offenses; that he was placed in the police "lineup," that his identity was pointed out by one of the "victims," and that he was subsequently turned over to the juvenile authorities and later to the Paterson police. There was not one iota of proof that he had committed any of the offenses referred to. Proof of the decedent's involvement in such *612 unlawful activities was an essential prerequisite to its admissibility on the issue of his moral characteristics as bearing on the question of damages.
The trial judge was undoubtedly faced with a difficult task throughout the trial. He was being almost continually called upon to sustain objections to questions which were beyond the issues or involved highly prejudicial matter, or to strike inadmissible testimony and instruct the jury to disregard it. In many cases, although the objections to questions were sustained or the answer stricken, the inference was clear and could hardly have escaped the jury. Even after the court had ruled, counsel frequently persisted along the same line. Thus, during the examination of one of the Passaic police officers, the following took place:
"Q. Sergeant, prior to the apprehension of these four young men, what had been going on in the first and second wards of Passaic?
Mr. Cohn: I object to that, your Honor.
The Court: I will sustain the objection.
Q. Sergeant, after the apprehension of these four men, the robberies in Passaic ceased, did they not?
A. That's right.
Mr. Cohn: I object to that.
The Court: The jury will disregard that." (Emphasis added.)
The record contains a considerable number of similar instances. Regardless of how well intentioned the jury was, it is difficult to conceive of its disregarding all of them. The plaintiff was entitled to a fair trial. The tendency of this type of interrogation was to bring about the opposite result. If confined to an isolated instance or two, it might be said that no prejudice to the plaintiff resulted. Taken in their aggregate, especially in connection with the highly prejudicial summation of defendants, which in itself requires reversal, they rendered the trial so unfair as to require a reversal. State v. Orecchio, 16 N.J. 125, 129 (1954); cf. State v. Clawans, 38 N.J. 162 (1962).
Reversed and remanded for new trial, costs to abide the event.