[Crim. No. 5252. First Appellate District, Division Two.—October 28, 1925.]

JOE MURPHY, Respondent, v. A. W. MURRAY, Acting Chief of Police, etc., Defendant; B. C. CROFT, Appellant.

[1] POLICE OFFICERS—DUTY IN MAKING ARRESTS—SELF-DEFENSE.—A police officer seeking to arrest one charged with crime is not acting in self-defense, but in defense of the state. The law requires him to make arrests under certain circumstances, and if he merely assumes the position of a private citizen protecting himself against harm, he is neglectful of the duty imposed upon him and is open to censure therefor.

[2] ID.—ARREST WITHOUT WARRANT—INJURY TO PARTY ARRESTED—LIABILITY OF OFFICER — GOOD FAITH — DAMAGES.—When a police officer, acting under the authority conferred by section 836 of the Penal Code, providing for making arrests without a warrant under certain circumstances, makes an arrest of one who afterward proves not to have committed a felony, or when, in attempting to make such an arrest, he causes injury to the party arrested, his liability for damages therefor depends upon the question whether he acted in good faith and had reasonable grounds for believing that the person did commit the felony.

[3] ID. — BELIEF THAT FELONY HAS BEEN COMMITTED — PROBABLE CAUSE—QUESTION OF LAW—APPEAL.—In such a case the primary question to be determined is whether the police officer had reasonable or probable cause for believing that the party whom he attempted to arrest had in fact committed a felony, and this the court must determine as a matter of law, and the appellate court is not bound by the conclusion of the trial judge on that issue.

1. See 3 Cal. Jur. 116.
2. See 3 Cal. Jur. 116; 11 R. C. L. 801.
3. See 3 Cal. Jur. 121; 2 R. C. L. 451.

[4] ID. — WHAT CONSTITUTES PROBABLE CAUSE. — Whether there is probable cause for making an arrest depends upon all the circumstances of each case, including delay which might enable the guilty person to escape, the nature of the information, the character of the person at whose instance the alleged wrongful arrest is made, and the extent of possible inquiry as to facts and circumstances.

[5] ID. — NEGLIGENCE — ACTION FOR DEATH — SHOOTING OF PERSON CHARGED WITH BURGLARY WHILE FLEEING FROM ARREST—PROBABLE CAUSE—EVIDENCE—FINDINGS.—In this action for damages for death caused by a police officer in attempting to make an arrest without warrant of a person charged with the commission of the crime of burglary, who was shot by said officer while endeavoring to escape in the night-time, there was no evidence to support the conclusion of the trial court that the police officer did not have reasonable cause to believe that the deceased had committed the burglary or that it was necessary in order to arrest him to fire the shot which caused his death.

---

(1) 17 C. J., p. 1252, n. 68.    (2) 5 C. J., p. 640, n. 14 New. (3) 4 C. J., p. 648, n. 32.    (4) 5 C. J., p. 417, n. 1; 32 Cyc., p. 402, n. 19.    (5) 17 C. J., p. 1309, n. 31.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles S. Crail, Judge. Reversed.

The facts are stated in the opinion of the court.

Jess E. Stephens, City Attorney, Chas. B. MacCoy, Deputy City Attorney, and Philip C. Sterry for Appellant.

N. R. Rutherford and Martin Forrest for Respondent.

NOURSE, J.—Plaintiff sued the defendant Murray as acting chief of police of the city of Los Angeles and the defendant Croft as a member of the police department of that city for damages for the death of his son caused by the defendant Croft while attempting to arrest the son. Judgment went in favor of the defendant Murray and in favor of the plaintiff as against the defendant Croft in the sum of two thousand six hundred dollars. The defendant Croft has appealed from the judgment upon the judgment-roll and a bill of exceptions.

---

4.   See 3 Cal. Jur. 120.

The facts of the case are that about 10:57 P. M. of the night of October 30, 1920, Officer Croft reported by telephone to the central police station and he was informed that a burglary had been committed at the home of a Mr. Eaton and was directed to go over there as quickly as possible. He picked up another member of the police department, Officer Bligh, and on the way to the place of the burglary they picked up a Mr. Kloepfel, asking him to direct them to the house they were seeking. When these three parties arrived at the Eaton home they immediately called Mr. Eaton out and he then informed them that his house had just been robbed. While Officer Croft was questioning him further as to the result of the burglary, Mr. Kloepfel called to him that two fellows were running away from the rear of the house. These four parties immediately started in pursuit, Croft running around the south side of the house and Bligh running around the other. The men pursued were at first about 75 feet in advance of Croft and were continually gaining as they ran. They separated in their course and when about 100 feet apart Croft called upon them to stop, that he was an officer and that he would shoot. They continued to run and Croft fired three shots in the air. Nelson, the companion of young Murphy, then stopped and threw up his hands, whereupon Croft called to him asking him if he knew the other fellow who ran down the hill, referring to young Murphy, who continued on his course down the ravine and into a grove of trees. Nelson denied that he knew him and Croft then called to him, asking if he knew where he lived. Nelson again answered no, and then he called to Murphy, who was then concealed in the grove of trees at a point about 250 feet from where the officer stood, demanding that he come out and threatening him that if he did not he would shoot. After waiting a minute or two and believing that Murphy was getting into a position to shoot at him, he fired once into the grove for the purpose, as he said, "to intimidate the fellow and make him come out." At that time Officer Bligh joined Croft and the two went into the grove and found that Murphy had been mortally wounded. The night in question was the night commonly called Hallowe'en and Nelson and Murphy afterward proved to be boys of about sixteen years of age who were engaged in Hallowe'en pranks.

They had previously approached the Eaton home from the rear and entered the back porch, after Murphy had cut the screen to unlock the door, and had there turned off the electric current, leaving the house in darkness. The Eatons were having a party at the time and some of the men of the party soon succeeded in turning the lights on again. About ten minutes later the boys approached the rear of the house again for the purpose, as stated by Nelson, of entering the back porch and again turning off the current. It was at this time that they were surprised by the police officers and attempted to flee from the premises. They were both about six feet in height and weighed about 150 or 155 pounds, in the darkness giving the appearance to the police officers of being adult men.

[1] The theory of respondent's case as maintained in the trial below and on this appeal is expressed in that portion of his brief which reads: "The rule of law applicable, we contend, is no different than it would be where a person is attacked by another, he may use only such force as would be necessary to protect himself from his assailant's attack." The error of this position is that when a police officer is seeking to arrest one charged with crime he is not acting in self-defense, but in defense of the state. The law requires him to make arrests under certain circumstances, and if he merely assumes the position of a private citizen protecting himself against harm he is neglectful of the duty imposed upon him and is open to censure therefor. The authority of the police officer to arrest without a warrant is fixed by section 836 of the Penal Code as follows: "3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it. . . . At night, when there is reasonable cause to believe that he has committed a felony." [2] When a peace officer acting under this authority makes an arrest of one who afterward proves not to have committed a felony, or when in attempting to make such an arrest he causes injury to the party arrested, his liability for damages therefor depends upon the question whether he acted in good faith and had reasonable grounds for believing that the person did commit the felony. The rule applicable here is found in 11 R. C. L., page 801, where it is said: "But since in such a case the person to be arrested is not specifically

indicated by a written warrant, and the officer must necessarily act on his own reasonable judgment and often in haste to prevent the escape of the criminal, he is protected if he acts in good faith and on reasonable grounds of suspicion, though the person arrested proves not to have been the felon, or no felony was in fact committed.'' **[3]** This being the issue which arises in all cases of this nature, the primary question to be determined is whether the peace officer had reasonable or probable cause for believing that the party whom he attempted to arrest had in fact committed a felony. This the court must determine as a matter of law and the appellate court is not bound by the conclusion of the trial judge on that issue. (*Michel* v. *Smith,* 188 Cal. 199, 206 [205 Pac. 113].)

**[4]** In the case just cited a rule of guidance for the trial courts was laid down where the supreme court say: ''Whether there is probable cause for making an arrest depends upon all the circumstances of each case, including delay which might enable the guilty person to escape, the nature of the information, the character of the person at whose instance the alleged wrongful arrest is made, and the extent of possible injury as to facts and circumstances.'' Reference should also be made to *People* v. *Kilvington,* 104 Cal. 86, 93 [43 Am. St. Rep. 73, 37 Pac. 799], where the supreme court say: ''In considering this question of probable cause upon the · part of the defendant to arrest the deceased, we are to look only at the facts and circumstances *presented to him at the time he was required to act.* The defendant did not recognize the deceased before he fired, and the fact that the latter was an innocent and respectable citizen, and who may have been fleeing from an assailant, cannot be allowed to affect the question we are now discussing.'' (Emphasis ours.) The latter case is closely analogous to the one under consideration. The defendant in that case was a police officer of the city of San Jose and was tried and convicted of murder. While in the performance of his duty he heard someone cry ''stop thief'' and observed two men, one in advance of the other, running down the street. The officer ordered the men to stop and threatened to shoot. The order was not obeyed and the officer fired, killing the pursued man, whom it was afterward shown had not committed any felony. The supreme

court in reversing the conviction pointed out that it was not only the right but the duty of the police officer to arrest any person in the night-time when he had reasonable ground to believe that such person had committed a felony, and held that the trial court should have instructed the jury that the defendant had reasonable cause to believe at the time of the killing that the deceased had committed a felony. In *People* v. *Adams,* 85 Cal. 231 [24 Pac. 629], the supreme court approved an instruction given to the jury to the effect that a peace officer making an arrest has the right to use all the force which from the surrounding circumstances seems to him as a reasonable man necessary, and that where the offense charged is a felony he has a right, if apparently necessary to a reasonable man, to kill the person whom he is seeking to arrest. In *People* v. *Matthews,* 6 Cal. Unrep. 341 [58 Pac. 371], the supreme court approved an instruction to the effect that if the defendant, a peace officer, had reasonable cause to believe, and did believe, that the deceased had committed a felony and had fired the fatal shot intending to shoot over the head of the deceased, the jury should find the defendant not guilty if they believed that such act on the part of the defendant was necessary for the purpose of effecting an arrest. The term "reasonable cause" as used in the Penal Code expresses the same thought as the term "probable cause" as used in the decisions cited. "Probable cause" is defined in *Michel* v. *Smith, supra,* page 205, "as a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true."

In view of these authorities we must approach the case as in the first instance to determine whether as a matter of law under the facts and circumstances as they appear in the record the appellant had reasonable or probable cause for believing at the time of the shooting that young Murphy had in fact committed a burglary and that it was necessary in order to prevent his escape to fire the shot into the grove of trees. In determining this question the case is made more difficult because the findings on all material issues of the case are either directly contrary to all the competent evidence appearing in the record or are unsupported by any evidence of any nature.

The meat of the case appears in finding No. 6, wherein the court found that about 10:57 P. M. on the night of October 30th Croft was informed by someone at the central police station that a burglary had been committed at 951 Micheltorena Street and that at some time after being informed, to wit, about one-half hour, Croft and Officer Bligh drove in an automobile to said address. Now, the only evidence covering this portion of the finding is found in the testimony of Officer Bligh, who testified that as soon as he and Croft got the call they drove to the place of the burglary "just as though we were going to a fire," and in the testimony of Croft that they went over as quickly as possible. Inasmuch as the complaint alleged and the trial court found to be true that the shooting occurred at about 10:30 P. M. of that evening, the finding that these officers had delayed answering the call for a period of one-half hour is so inconsistent with the pleading and other finding that it must be disregarded. In the same finding the trial court found that it was not true that when the officers arrived at the Eaton home, Eaton informed them "that his house had just been burglarized." The only evidence covering this portion of the finding is found in the testimony of Croft as follows: "He said: 'My house *has just been robbed';* and I said, 'What did they take?' And he said, 'They cleaned me out,' in a decided manner. And I asked him again, 'What did they take?' and he said, 'A hundred and fifty dollars' worth of silverware and my wife's jewelry and good clothes,' " and from the testimony of the same witness that from Eaton's actions and the tone of his voice he was led to believe that the burglary had just occurred. The finding that Russel Murphy, the deceased, was not guilty of the crime of burglary or any misdemeanor is not supported by any evidence. An offer was made of the record in the juvenile court wherein Murphy's companion was tried and found not guilty of the burglary. In the record before us no proof was made that Murphy was not guilty of any crime or any misdemeanor. The finding that it was not true that when Eaton informed Croft that a burglary had been committed the latter commenced an investigation or that while in the course of such investigation someone called to Croft "there they go," or words to that effect, is contrary to all the evidence. The only evidence of this subject is found

in the testimony of Croft to the effect that he was questioning Eaton regarding the burglary when Kloepfel drew his attention to the two boys at the back of the house, and, pointing to them, "There is the two fellows running sneaking away right now"; and in the testimony of the witness Kloepfel to the same effect. The finding that when Croft started in pursuit of Murphy and Nelson he *overtook* Nelson is not supported by any evidence. The only testimony on the subject. is that of Croft that when Nelson stopped in obedience to the officer's command they were then about 200 feet apart and that Croft continued after Murphy while Mr. Eaton and Officer Bligh approached and put Nelson under arrest. The finding that Murphy in obedience to the command of the officer "attempted to come out of said grove" is unsupported by any evidence. The evidence is that while Croft was at a distance of 250 feet from the grove he called upon Murphy to come out and threatened to shoot, but that Murphy made no attempt to come out.

[5] The real facts of the case as disclosed by the record are that Croft went to the place of the burglary with all possible speed and while investigating the charge his attention was suddenly directed to these two boys who were running away from the rear of the house. The night was dark and it was impossible for the officer to determine their ages. The fact that they were running in the darkness from the premises which had been burglarized and their refusal to heed the repeated commands to stop were sufficient to give the officer reasonable grounds to believe that they had participated in the felony. All the testimony goes to show that both officers were acting in good faith, that Croft honestly believed that the boys had participated in the felony and were endeavoring to escape into the darkness, and as to Murphy he believed that he was endeavoring to secure a favorable position in the grove of trees to resist the arrest and that all the shots fired by Croft were fired into the air for the purpose of intimidating the boys and to bring them to a stop. There is therefore no evidence to support the conclusion that Croft did not have reasonable cause to believe that Murphy had committed the burglary or that it was necessary in order to arrest him to fire the shot which caused his death. The case comes squarely

within the rule of *Michel* v. *Smith, supra,* and is controlled by that decision.

Judgment reversed.

Langdon, P. J., and Sturtevant, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 26, 1925.